Good morning, your honors. May it please the court, Steven Dunkel for Brett Vernon. It cannot be accurately stated that, as a matter of law, the report of a firearm being present in a home, combined with officers overhearing a statement about putting that firearm away or hiding that firearm, can justify a warrantless search of the home based on... It wasn't just a report, though. It was a 911 report. Does that add anything to the calculus? It does add something to the... What does it add? Two separate people make an emergency call about somebody with a gun. Well, the term emergency... The person with the gun is drinking. Right, that there's beer present as well. Drinking. All right, go ahead. Well, to answer Judge Trott's question, it is a 911 call, which does suggest that the caller thought it was important enough to alert the police. Two callers? Two callers thought it was important enough to alert the police. And when you look at the language used by those callers, this was not the sort of hysterical 911 call that has come up in other cases. Well, did the police review the 911 call before they're told? 911 calls, people with gun and beer? They didn't listen to the tape. They didn't listen to the tape. They get dispatched on a 911 call. Guns and beer. That's correct, your honor. On a roof? On a roof. And the dispatcher who took the call... Not a place where we usually find either guns or beer. Well, and I don't... It may be unusual in some contexts, and actually not that the police were aware of this at the time. It's one of those cases where if the police don't roll and somebody gets shot, guess what happens then? They get sued. Well... The police. And the point here isn't that the police shouldn't have gone out to the home to investigate, or that the 911 call was nothing to be concerned about at all. They hear somebody saying, hide the gun. Or make sure the gun's been put away, which is a disputed issue in the case. So when you look at the actual language, though, used in the 911 call, there's no description of a particular crime. It's something suspicious enough where it's been reported to police. They do what they're supposed to do at that point. Yeah, you know, when you get a 911 call, you don't say, we're not going to do anything until we can go listen to the tape. And that's not what I'm suggesting. It is what you're suggesting. Because you're saying we have to go back to the tape. And if we do that, we'll see nobody was hysterical. But that isn't the way it works. The whole system is set up so that there's no delay of time. If there's a delay of time, all hell breaks loose. Why did the 911 people sit on their hands while somebody was out there with a gun drinking on top of a roof? And all that can be related to the officers is what's said to the 911 dispatcher, is my point. And one of the two dispatchers responds by saying, is this a prank call or this may be a prank call, just to suggest the tone that was used or how they interpreted that. They told the officers it was a prank call? I don't know that they told the officers it was a prank call. But it does suggest they didn't tell the officers there was a hysterical caller. All the officers do, all they know is they got an emergency 911 call. That's their frame of mind. Right. And I see the court's point. When they do get to the scene and investigate, however, the statement about putting away the gun or hiding the gun, while I do agree it suggests there is in fact a gun present at the house, beyond that, Somebody doesn't want it to be seen. or just wants to make sure it's secured, which is why there is a disputed issue of fact there that it should be up to a jury to determine what can be inferred from that statement or not. Once that statement is heard, there still isn't probable cause to believe that either a crime has occurred with exigency, justifying a search, or to believe that there's an actual... That's a question for the other side. What crime was it? Right, exactly. And I would point out that there's not evidence in the record to support typical kinds of crimes that would go along with displaying a firearm, like brandishing, like assault, and certainly nothing suggesting that they had probable cause to believe that a shooting was about to occur. This is not a case like Ryburn cited by my opponent, the recent U.S. Supreme Court case, where there's evidence in the record that someone inside was going to do something dangerous based on some report of writing a letter or making a statement. This is not a case like Lalonde even, where a neighbor informs the police of the sort of person they may be dealing with. I'm not even sure that if you have exigent circumstances, you have to be able to pinpoint what the crime was. I mean, if you've got guns and things flying around, first you calm down the circumstances, then the DA finds out whether it was a crime or not. And I don't mean to split hairs in terms of identifying a particular crime. There has to be a crime, and gun possession by itself is not a crime whether it's... But there may be a crime about to occur. Again, having alcohol and guns on a roof is not a typical situation, and there may be something very... The cops don't have to stand around and wait for a sniper on a roof to start shooting at neighbors before they act, if they've got information that there's a guy on a roof with alcohol and guns. I agree with... The defense was we had guns on the roof. They were just paintball guns. Well, and that actually looks like that's what actually happened. It wasn't what the officers knew at the time, and as unusual as that is... Which is why nobody was prosecuted here. Right. The presence of the gun on the roof, though, isn't occurring when they show up, so it's not a situation where they believe there may be a sniper on the roof. What they believe is that the gun that was on the roof, it looks like anyway, and what I think a reasonable officer would believe is that it's now inside the house. It's a huge leap to take the next step to say, and that means there's about to be a shooting, given what they observe when they arrive, which is a party. Police just aren't supposed to pick up the dead bodies after it's over. They're supposed to try to intercept things before anybody does get shot. Now, after all this was settled down, sure, now we see a lot of things in retrospect that make it pretty clear that it was just a bunch of people doing whatever it was, but looking at it from the standpoint of the police going into it, which is what I think we have to do, was this in any way an unreasonable search and seizure? Yes, absolutely, I believe it was unreasonable. They're aware that there's a gun in the house, but there's nothing else supporting actual criminal activity. I'll certainly concede that the rooftop part is unusual. I don't think that the inference is there, a reasonable inference, that that means that it was a sniper or that something illegal was occurring. I have to tell you, if two people call in to 911, somebody's got to roll and do something about it. Well, and they did do something about it. My contention, though, is the problem begins when they enter the house without a warrant. They should have had a warrant. They should have had a warrant once they arrived. The whole point of emergency circumstances or exigent circumstances is you don't have to get one. And the reason I say, I shouldn't say they had a basis to get a warrant, only that they shouldn't have entered without a warrant because there were not exigent circumstances or emergency situations other than speculation that any time you have a gun in a home with alcohol, that may be a dangerous situation or that it's on a roof. Make it true. In this case, a gun on the roof with alcohol. On the roof. Why? Well, and I think we know, and again, this is from hindsight, because people were sitting in chairs on a roof enjoying the day and drinking a beer and having paintball guns. But they were just having paintball guns? They weren't using the paintball guns? There's no evidence they were using the paintball guns. They brought them to the party. Well, the police don't know that. Right. They brought their paintball guns, and they don't know that they haven't been used in any way. Right. If they had been used, I think the cops would have additional reason for wanting to go in and take action because anybody was shooting off a roof with a paintball gun. And there's no evidence of that on the record. What we know, and I think that's certainly a reasonable question, Judge Duffy. It seems what you're arguing is, at the very least, the police made a mistake. And if we get that far, I mean, it seems qualified immunity would protect them because this was not an unreasonable mistake. That's not what I'm arguing, that they absolutely made an unreasonable mistake. Why is it unreasonable under these circumstances? Let's start from the proposition, okay, it's a big mistake. It wasn't what they thought it was. But why was it unreasonable in qualified immunity terms for them to do what they did? Because they acted only based on knowing that there was a firearm in the home that had been put away, and that by itself does not suggest any kind of criminal activity or any kind of emergency situation. Once again, you're excluding that they were told to roll on a 911 call. The fact that it's a 911 call. Police get a 911 call, guns. Right, and at that point they show up and investigate and don't see anything corroborating that a crime is occurring or that there's an emergency situation. They don't encounter the distraught person at the party. They don't encounter or witness a fight about to break out, like in some of these other cases where the report is made, they show up and they see something about to happen. It's merely a hunch and not a reasonable. Well, they didn't just show up and break down the door. They started to try to find out which one it was, scoped the place out, and then they heard this conversation. Right, and during that time they evaluated the situation and did not have any additional facts in front of them. And I'm not asking them to split hairs, and I'm understanding. I certainly respect the court's point that they're responding to a 911 call and have to make a quick decision. On the other hand, the thing that they're responding to, the person on the roof, is no longer occurring. At that point they're assessing is there a crime going on, is there an emergency, and there are no factors on the record outside of the statement about putting the gun away that further would corroborate this being the kind of situation that necessitates going into the house. And I think when you look at the factors they do encounter, it's a party, it's a barbecue. There's no one disputing that. It's not a situation where the police thought that they observed additional conduct in the backyard, through the window, in the front of the house, that would justify entering the home. It's simply the idea that someone had reported a gun being on the roof with beer, that the gun has now been put back into the home seemingly, or put away as someone puts it. And they infer from that that there must be more going on. At that point it's not probable cause, and it's not reasonable to believe it's an emergency. It's just a mere hunch that maybe they'll find something if they go inside. And I don't mean to be overly critical of the officers in terms of, of course, they have to go out when there's a 911 call. I mean, that's, I think, not what's in dispute here. What's in dispute here is what are they supposed to do when they get there. They make their assessment, and then they take whatever action is reasonable. The action taken in this particular case was not reasonable because it was just limited to those bare-bone facts. And given that this is a denial of a motion for, I'm sorry, granting of a motion for summary judgment, that decision is based on whether it can be said as a matter of law standard, that that's enough for a warrantless search. And I would respectfully submit that there's not case law, there's not authority analyzing the presence of a gun with beer that says that can lead to a warrantless search. And, in fact, gun ownership is a protected right under the Second Amendment. It's not inherently criminal or inherently illegal activity. And in this particular case, there wasn't anything more than that. If the Court doesn't have further questions, I'd reserve the rest of the time. Thank you. May it please the Court. Stephen Wiley, City Attorney for the Santa Barbara City Police Officers, Eduardo Ruiz and Thomas Van Eck. The City's position is, in fact, that this was good, solid police work. Not only was there not a mistake, our position is, our belief is, that these officers should be commended are acted in a very restrained, experienced way. And that, you know, as the appellants mentioned, we have filed a letter brief mentioning the Ryburn v. Hough case, the January 2012 decision by the Supreme Court. That's what we used to call in the old days a case that's on all fours. Not necessarily the facts, of course. That's a qualified immunity case. It is. Your position here is you don't even have to get that far because there wasn't a mistake, right? That's correct. Much like the district court analysis, which found there was both probable cause and exigent circumstances and an emergency. But, you know, Ryburn's about the circumstances under which it may be proper, may be constitutionally proper for officers to enter a home when they're trying to figure out what is going on. And fundamentally what this appeal asserts is the false understanding of hindsight. And that's what Ryburn really, I think, one of the key points of Ryburn is that we all need, whether it's the lawyers or the courts, to try to put ourselves in the position of the police officers. What were they thinking? What did they know? What were they told at the time this happened? What were they told? How did the dispatchers work? The 911 call goes into the police department? Yes. Two calls. Basically. When somebody gets the calls, what does that person do and how does that person do it? Dispatches it over the police radio frequency to their. . . To the black and whites or who's in the field? Yes. And do we have the tape of that? We do. In fact, it is quoted accurately in the appellant's opening brief. It essentially says a man or, no, two men with a rifle and beers on the roof. And I think there's a mention of a chair. There's a second call that's a bit more ambiguous, but within a minute, same address, about men on the roof. And this is not, for example, when you say put yourself in the position of the officers when this happened. What did they know? This is not a 911 call of a man. I saw a man take a rifle out of the trunk of his car. Or I saw someone showing off a rifle in a backyard. It's important, it's critical to parse these facts very carefully. This is about a call with men on the roof. And the officers had to have been thinking, what in God's name are people doing with a rifle, not a gun, on a roof, drinking beer? Did they say a rifle? Yes, they said a rifle. I'm talking about the dispatcher. The 911 caller said rifle. Rifle. And then I'm more interested in what the dispatcher said. Okay. And we have that in the record. That's at the city's excerpt of the record, the supplemental excerpt. It starts at page 100, and that's called a computer-aided dispatch. That's a digital recording of the actual conversation between the dispatcher and the police officers, and then among the officers themselves. And it's very precise, and that's a key aspect here. Got it right there? Yes. Why don't you read it for us? Well, I've got something. For example, this started at 6.40 p.m. on March 21, 2009. First day of spring, 6.40 p.m., the call comes in. Another call, 6.41, as I said, man with a rifle on the roof. We want to hear what the police officers were told by the dispatcher. Well, these are just digital recordings, so the type-out is just a summary, very brief. This is at 8.40, so 6.40 p.m. on March 21, rifle and case of beer on roof, NFD, reporting party hung up. NFD, no further description? Right. 8.41, a minute later approximately. 8.41 or 6.41? I'm sorry, 18.41. Got it, okay. A second call, and I'm not clear myself on how the 911 call on this second call was worded, but it is in their brief. This says, uncooperative ADV subject on the roof. I think it's then, so they arrive at the scene. ADV means what? I'm not sure. It could be adverse, I suppose. That's 6.41 p.m., Officer Lazarus arrives on the scene at 6.52. This is a modest residential neighborhood, modest homes, modest blocks. Officer Lazarus is one of the two officers that decides to go to the backyard of this home through the yard of the home behind it. And at 7.06, so about 14 minutes after he arrives at the scene, and, again, I'm referring all to the computer-aided dispatch, he says, and it's here, heard subject in backyard mention a shotgun. A minute later, he says, male subject advised to hide shotgun. Again, my point, our point, these words are important. You don't know what ADV means? No, I don't. There's a lot in this. That's the second. That's the second call. The appellants are trying to mischaracterize this by using terms like gun instead of rifle, by saying someone's putting a gun away. Now, of course, you are required to make all reasonable inferences in favor of the nonmoving party. But here we really don't have a factual dispute where it's appropriate to ignore Officer Lazarus's evidence and to only credit the deposition testimony months after the fact of the person who admits saying, well, I did have this conversation. I think it was about putting a gun away. Officer Lazarus's computer-aided dispatch comments to the other officers, and, of course, the two officers that went in the home knew all of this, was contemporaneous, was in minutes. Why would he have the foresight to exaggerate or lie and start talking about a shotgun and use the term hide? And, again, this is not putting a gun away. It's hiding something. That's evidence of criminality. I don't want to belabor this point. I have the sense that the Court understands our point about the false understanding of hindsight and second-guessing. No, we do believe there were – there was probable cause for a crime, and the crime is brandishing a rifle. If the call had been man with a rifle on a college campus or men with a rifle attempting to get to the top of a high-rise building or a man climbing the tower on a college campus – and I say those things because, again, it's important to understand what these officers were thinking. So, in conclusion, again, we say that these officers, whether it was the reason to enter the home, which was both exigent circumstances and emergency, and the actions that they took once they entered the home, are actually – show experienced officers using common sense and good judgment and ultimately getting to the bottom of a situation that could have been a very terrible situation based on what can happen nowadays and what they were told when they were dispatched to the scene. Thank you. Thank you, Mr. Wiley. Mr. Dunkle, I think you have some reserved time if you'd like to use it. Thank you, Your Honor. In the analogy with a man being on a college campus or climbing a tower, I mean, that's sort of my point here, is that this is a private home. It's not a situation where possession of a gun inherently suggests that level of danger that invokes horrific school shootings or that sort of thing. It's also why Ryburn is not on all fours, because in that case the thrust of why the warrantless search was appropriate was largely because there's a report that someone was going to come to school and shoot people with a gun, and the police wanted to investigate that. The criminality of those sorts of incidents is at the forefront of what the officers are informed of. With regard to the issue of rifle versus gun, I mean, I certainly take issue with calling that a mischaracterization, and frankly I'm not sure I see the significance there anyway. If it's a handgun or a rifle, it would, I think, be the same on a roof. Do you know what ADV means? The only thing I can come close to is computer-aided dispatch. At least you've got an AD in there, but I don't know what the V is. I don't, and I agree with my opponent. It might mean adverse subject. I'm not sure. There's certainly plenty on looking that up later. There is testimony in one of the depositions of the officer, Van Eyck, where he says, Dispatch advised that RP, reporting party, had seen a man on the roof with a gun or a rifle or of a neighboring house. Question, you said he thought it was a rifle. Answer, I don't recall his specific verbiage, some sort of firearm. So it's not an attempt, certainly, to mislead there. Either way, I believe that there is not evidence supporting a finding that, as a matter of law, that this is something that doesn't even go to a jury because it's so clearly established in the law that any time you have a report on 911 of someone with a gun and beer combined with some sort of verification of the presence of a gun, that it necessarily means that a warrantless search is justified and that that's so clear that it has to be taken out of the hands of a jury and decided on summary judgment. In fact, the point where the officer's conduct becomes unreasonable is not when they show up and investigate. It's when they take the lack of evidence of any sort of a crime or any actual emergency other than speculation that guns can be dangerous. But, again, this is a gun in a private residence where there is some protection for that. That's the point where their conduct becomes unreasonable. And on that basis, I would ask the Court to reverse the grant of summary judgment. Thank you. Thank you, Mr. Tucker. We thank both parties for the argument. With that, the Court has completed the oral argument calendar, and the Court stands adjourned.
judges: Duffy, Trott, Bybee